**NOT FOR PUBLICATION  IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000423**
**22-MAR-2021**
**07:48 AM**
**Dkt. 283 MO**

NO. CAAP-16-0000423

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


ASSOCIATION OF APARTMENT OWNERS OF HOLOLANI,
by its Board of Directors, Plaintiff-Appellee,
v.
LIZ MILLER; DAN MILLER,
Defendants-Appellants
and
JOHN DOES 1-5; JANE DOES 1-5, Defendants


DANIEL P. MILLER and ELIZABETH A. MILLER,
Counterclaimants-Appellants,
v.
ASSOCIATION OF APARTMENT OWNERS OF HOLOLANI, a Hawaii
nonprofit corporation, Counterclaim Defendant-Appellee,
and
JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10,
DOE PARTNERSHIPS 1-10 and DOE ENTITIES 1-10, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 06-1-0249(3))


MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Leonard and Nakasone, JJ.)

The Hololani is an oceanfront condominium on the western shore of Maui, which consists of two, eight-story residential buildings and an office building. Attached to each residential apartment is a large makai-facing lanai, and attached to each end unit is a smaller lanai.  By the time Defendants-Appellants Elizabeth A. Miller and Daniel P. Miller (collectively **the Millers**) purchased apartment B-604 in 2004, at least two

apartment owners had already enclosed their lanai either fully or partially.

The Association of Apartment Owners of Hololani (**Association**) brought this action against the Millers asserting they had commenced construction of an enclosure of their large lanai and relocated their front door without approval from the Association's Board of Directors (**Board**) and the other owners, as required by the Association's governing documents.  After extensive litigation, including a jury trial, the trial court ordered the Millers to remove the enclosure of their lanai and return their front door to its original location.

The Millers appeal from: (1) the "First Amended Final Judgment" filed on February 11, 2016, and (2) the "Order Denying Defendants/Counterclaimants Daniel P. Miller and Elizabeth A. Miller's Motion to Alter or Amend First Amended Final Judgment," filed on May 6, 2016, both entered by the Circuit Court of the Second Circuit (**Circuit Court**).[1]

The Millers contend that: (1) the Circuit Court erred in denying their renewed motion for judgment as a matter of law because the jury's findings were unsupported and against the manifest weight of the evidence; (2) there are legal causes for a new trial; and (3) the Circuit Court erred in denying the Millers' Motion to Alter and Amend Judgment.

For the reasons discussed below, we affirm.

I.   **The Circuit Court properly denied the Millers' Renewed Motion for Judgment as a Matter of Law or, Alternatively, for New Trial, because the evidence supports the verdict**

After the jury returned a special verdict in favor of the Association, the Millers filed a Renewed Motion for Judgment as a Matter of Law or, Alternatively, for New Trial pursuant to Hawaiʻi Rules of Civil Procedure (**HRCP**) Rule 50(b).[2]  The Millers

---

[1]  The Honorable Joseph E. Cardoza presided.

[2]  HRCP Rule 50 provides, in part,

> **(a) Judgment as a Matter of Law**.

(continued...)

2

contend that the Circuit Court erred in denying their renewed
motion for judgment as a matter of law because the jury's
findings were against the manifest weight of the evidence.  The
Millers assert the jury's findings as to ten of the eleven
special verdict questions were either not supported by sufficient
evidence or were against the manifest weight of the evidence so
as to warrant either judgment as a matter of law or a new trial.[3]

---

[2](...continued)

> (1) If during a trial by jury a party has been fully
> heard on an issue and there is no legally sufficient
> evidentiary basis for a reasonable jury to find for
> that party on that issue, the court may determine the
> issue against that party and may grant a motion for
> judgment as a matter of law against that party with
> respect to a claim or defense that cannot under the
> controlling law be maintained or defeated without a
> favorable finding on that issue.
>
> (2) Motions for judgment as a matter of law may be
> made at any time before submission of the case to the
> jury. Such a motion shall specify the judgment sought
> and the law and the facts on which the moving party is
> entitled to the judgment.
>
> **(b) Renewing Motion for Judgment After Trial; Alternative
> Motion for New Trial.** If, for any reason, the court does not
> grant a motion for judgment as a matter of law made at the
> close of all the evidence, the court is considered to have
> submitted the action to the jury subject to the court's
> later deciding the legal questions raised by the motion. The
> movant may renew its request for judgment as a matter of law
> by filing a motion no later than 10 days after entry of
> judgment--and may alternatively request a new trial or join
> a motion for a new trial under Rule 59. In ruling on a
> renewed motion, the court may:
>
>> (1) if a verdict was returned:
>>
>>> (A) allow the judgment to stand,
>>>
>>> (B) order a new trial, or
>>>
>>> (C) direct entry of judgment as a matter of law;
>>> or
>>
>> (2) if no verdict was returned:
>>
>>> (A) order a new trial, or
>>>
>>> (B) direct entry of judgment as a matter of law.

[3]  The only special verdict question the Millers do not object to is
number 8, in which the jury found that the Board had not proven by a
preponderance of the evidence that the Millers' moving their entryway door
affected the structural integrity of the building.

> A trial court's ruling on a motion for judgment as a matter of law is reviewed *de novo*. A motion for judgment as a matter of law may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Calipjo v. Purdy, 144 Hawaiʻi 266, 276, 439 P.3d 218, 228 (2019) (internal quotation marks and citations omitted).

### A. Special Verdict Question Nos. 1 and 2: there was evidence for the jury's finding that the Millers' lanai enclosure was a material structure added to a common element

To answer special verdict questions 1 and 2, the jury was required to make three separate findings: (1) that the lanai was a common element, (2) that the enclosure was a material structure, and (3) that the enclosure was added to a common element.  As to the first finding, there was evidence that the lanai floor and ceiling are common elements.  The Association Declaration defined the Hololani's apartments as follows:

> The respective apartment shall not be deemed to include the undecorated or unfinished surfaces of the perimeter walls or interior loading walls, the floors and ceilings surrounding each apartment, or any pipes, wires, conduits or other utility or service lines running through such apartment which are utilized for or serve more than one apartment, the same being deemed common elements as hereinafter provided. <u>Each apartment shall be deemed to include</u> the interior decorated or finished surfaces of all walls, floors and ceilings and partitions within the perimeter walls, all window glass, <u>the unenclosed space within the lanai, the air space within the lanai and the perimeter walls</u>, together with fixtures, appliances and other improvements located therein.

(Emphasis added).  Based on the Declaration, the jury was instructed that:

> Common elements means: all portions of a condominium other than the units; and any other interests in real estate for the benefit of unit owners that are subject to the declaration.  At the Hololani, <u>common elements are all</u> foundations, columns, girders, beams, supports, bearing walls, main walls, roofs, <u>floors, ceilings, balconies,</u> walkways, elevators, stairways, hallways, corridors and ducts of the buildings, and all other parts of the project which are not included in the definition of an apartment.

(Emphasis added).  Given the Declaration and instruction to the jury, there was evidence that each apartment includes the air

4

space within its respective lanai, but not the lanai's floor or ceiling, which are part of the common elements.

As to the second finding, there was evidence that the enclosure was material.  The jury was instructed that non-material structural addition means

> a structural addition to the common elements that does not jeopardize the soundness or safety of the property, reduce the value thereof, impair any easement or hereditament, detract from the appearance of the project, interfere with or deprive any nonconsenting owner of the use or enjoyment of any part of property, or directly affect any nonconsenting owner.

(Emphases added).

Lt. Scott English of the Fire Prevention Bureau testified that the Millers' lanai enclosure jeopardized the soundness or safety of the building because the enclosure did not comply with the fire code, and that he would have denied the Millers' building permit had the Millers applied for a permit to enclose the lanai instead of what they claimed on their application was alteration of interior walls.  Thomas W.H. Boomer (**Boomer**), president of Structural Concrete Bonding & Restoration, Inc., was hired to repair and waterproof the concrete lanai slabs of the Hololani.  Boomer testified that during the repairs, a parapet weighing around 600-700 pounds fell off which prompted further inspection of the lanais.  Boomer discovered that the lanais were in very poor condition and posed an extremely high safety risk requiring the removal of the parapets, repair to the concrete vertical faces, and reinstallation of the railings three inches further back.  Although the majority of the other lanais required repairs, the Millers' lanai enclosure prevented Boomer from assessing the condition of their lanai, prevented him from conducting any necessary repair work, and thus he could not provide a warranty or guarantee of safety or soundness for the Millers' lanai.

Monie Thompson (**Thompson**), the owner of the apartment directly below the Millers' unit, testified that she and her husband went to the Millers' unit due to the noise of construction.  Thompson observed the contractors use a nail gun

to drive nails into the ceiling and could see concrete falling. Thompson expressed her concern to the Board that the Millers' construction added substantial weight to the building and the nails in the concrete ceiling and floor were splintering the concrete, affecting the structural integrity of the building. Photos taken by Thompson also show spalling damage to the concrete of the Millers' lanai.  Thus, there was evidence that the addition to the Millers' lanai was a material structure.

There was also evidence that the addition was material for reason of detraction from the appearance of the building. Photos depict the enclosure as physically altering the look of the Hololani's exterior facade by disrupting the uniformity of the exterior facade.  Thompson testified about the effect the enclosure had on the building at night:

> It's quite a different feeling at night. If you've ever been to a movie theater or been to a stage production, you know how it gets at night, after the sun goes down. It is just really black and you see our beautiful stars. But if you turn on the movie or turn on a light in the apartment, it's suddenly like a stage. So everything on the interior is lit up and everything on the exterior is the blackened dark sky.
>
> So because [the Millers'] condo no longer has the six or seven-foot depth of the balcony, their whole bedroom is seven feet closer to the edge of the railing.
>
> So at night, when the doors are open, the bedroom with the lights on is a stage. It's a stage for all to see in the entire building.

Owners also raised their concerns through emails regarding the disruption made by the Millers to the outward aesthetics of Hololani.

As to the third finding, there was evidence that the enclosure had been added to the common elements by use of a nail gun and that concrete had been poured onto the floor to level the lanai with the bedroom.  Photos also show the attachment of the enclosure to the ceiling and floor of the lanai.

Therefore, there is evidence to support the jury's findings in special verdict questions numbers 1 and 2 that the lanai enclosure was a material structure added to a common element.

B.   **Special Verdict Question No. 3: there was evidence for the jury's finding that the Association reasonably and in good faith concluded that the Millers should be prohibited from enclosing the lanai**

The Association's Bylaws state that additions or alterations to common elements--such as the lanai floor and ceiling--require not only written approval by the Board, but also approval by a majority of owners, including all owners directly affected by the construction.  There is no evidence in the record that a majority of the owners assented to the construction of the enclosure; to the contrary, there is evidence that the Millers' construction project upset so many owners that more than 50% of the owners voted to remove members of the Board for the handling of the Millers' lanai construction.

Faced with a majority of owners opposing the Millers' project, including other owners directly affected by the construction, there is evidence to support the jury's finding that the Association reasonably and in good faith concluded that the Millers should be prohibited from enclosing their lanai.

C.   **Special Verdict Question No. 4: there was evidence for the jury's finding that the Millers did not obtain the Board's approval prior to construction of their lanai enclosure**

The Association's Bylaws require that construction to any common elements may only be done with "prior written consent of the Board and in accordance with plans and specifications including detailed plot plan, prepared by a licensed architect and also approved by the Board and by a majority of owners, including all owners directly affected by such construction[.]"

The Bylaws also provide that the Board is composed of seven persons, and further provides:

> Section 10. Board of Directors' Quorum. At all meetings of the Board of Directors, a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of **the majority of the Directors present at the meeting** at which a quorum is present shall be the acts of the board of Directors.

(Emphasis added).

The Minutes for a board meeting on May 17, 2005, indicate the board considered a request seeking permission for a tinted glass lanai enclosure to the Millers' unit.  These Minutes also reflect which of the board members were present and how they voted.  The Minutes state in relevant part:

>Board Members Present:        Meta Shannon, Ray Sievers, Jack Stoughton, John Knox
>
>Board Member Present
>By Telephone:        Liz Miller, Dan Stockhammer
>
>Board Member Absent:        Roger Fitz-Gerald
>
>. . . .
>
>I. DECLARATION OF QUORUM
>A quorum was declared with six of seven Directors present.
>
>. . . .
>
>Unit B604 had submitted plans requesting permission for a tinted glass lanai enclosure. According to standards written in November 1998, an after market tinting of windows is allowed.
>
>There was discussion about the design and structural integrity of the building, and options for UV window protection.
>
>MOTION:      To approve the request from the Owners of Unit B604 to proceed with the lanai enclosure, including the tinted window as requested.
>
>           Shannon/Stockhammer
>
>           <u>Directors Miller and Knox abstained. Director Fitz-Gerald was excused for medical reasons. Director Stoughton opposed. Directors Sievers, Shannon and Stockhammer voted in favor.</u> The Motion passed by a majority vote.
>
>The new standard would be tinted glass for any Owner installing a glass lanai enclosure.

(Emphasis added).

The Millers contend that the Minutes state the Board approved their lanai enclosure by a majority vote.  The Association, on the other hand, argues that the Minutes improperly state the motion on the lanai enclosure was passed, because given the Association's Bylaws and the votes shown in the Minutes, there was not a majority vote by the board members who were present in favor of the motion.  We agree with the Association.

The Association argued at trial that the evidence showed the Millers did not receive a majority vote at the board meeting.  The Minutes reflect there were a total of six board members present at the meeting, either in person or by phone.[4] One board member was absent.  The Minutes further reflect that two board members abstained, one board member opposed the motion, and three board members voted in favor of the motion.  Thus, only three of the six board members who were present voted in favor of the motion, which did not constitute a majority.  Stuart Allen (**Allen**), who served as president of the Board, testified that under the Bylaws, abstentions counted as "no" votes, and thus with six Board members present at the meeting and three votes in favor of approving the Millers' request, the lanai enclosure had not been approved by the Board.

Therefore, there is evidence supporting the jury's finding that the Millers did not obtain the requisite Board approval prior to constructing their lanai enclosure.

D. **Special Verdict Question No. 5: there was evidence for the jury's finding that the Board did not unreasonably withhold its approval of the Millers' after-the-fact request to move their entryway door**

The Millers contend that the Board was unreasonable in its application of the Bylaws' requirements as they pertain to altering common elements.  In particular, the Millers contend that,

> [i]nasmuch as both the [Association] and the jury found that the relocation of the Miller's [sic] door did not have a structural affect [sic] on the building, it was patently unreasonable for the [Association] to require the Millers get an engineer's report to state that fact, require that an architect review the report, and require that a ballot to all owners seeking 75% approval "to change the documents to approve the alteration in the common elements," be sent.

(Emphases added).  However, the Millers mischaracterize the Board's position regarding possible structural damage caused by relocation of the door.  During the relevant board meeting, although the Board noted that the relocation of the door did not

---

[4]  The parties do not contest whether a board member can be "present" by phone.

appear to have a structural impact on the building, there was no associated expert's opinion in support of this contention, and the Board unanimously agreed "[t]o ask the owner of B604 to submit a change of door application to the Board for approval, with a report from an engineer stating that the change did not impact the structural integrity of the building."  Therefore, when viewed in the light most favorable to the Association, the Board moved to engage in factfinding in order to verify that the change had not impaired the integrity of the structure.

Second, as discussed, the Bylaws require that an owner desiring to make any alterations to common elements submit to the Board "plans and specifications including detailed plot plan, prepared by a licensed architect," and that both the Board and a specified percentage of the owners approve alterations to common elements.  The Board's action was therefore consistent with the requirements of the Bylaws.

Third, the Millers mistakenly contend that the jury failed to follow jury instruction number 27, which provided, in relevant part, "nonmaterial additions to or alterations of the common elements or units. . . shall require approval only by the board, which shall not unreasonably withhold the approval, and such percentage, number, or group of unit owners as may be required by the declaration or bylaws." (emphasis added).  The Bylaws and the Declaration require that any structural alterations to or exterior changes to any common elements be approved by a majority of the owners or such larger percentage required by law.

Thompson testified that the wall next to the front door was a common element, and that, when the Board designated the front doors as private property, it reserved the right to have a uniform appearance.  The record and transcripts contain a plethora of evidence that the owners are highly concerned with maintaining uniformity of the building's appearance.  For example, the Bylaws and House Rules prohibit decorating doors, walkways, or common areas with non-seasonal items without Board

10

approval and specify which color any window coverings may have when viewed from the outside.  Mrs. Miller became aware of other owners' concern with the Hololani's appearance as early as 2005, and multiple letters and emails between the owners evince their outrage over the loss of uniformity.

Therefore, there is evidence to support the jury's finding that the Board did not unreasonably withhold its approval of the Millers' after-the-fact request to move their entryway door.

E.     **Special Verdict Question No. 6: there was evidence for the jury's finding that the affirmative defense of estoppel did not prevent the Board from denying the Millers' request to install the lanai enclosure**

The jury was instructed on the affirmative defense of estoppel that:

> Equitable estoppel requires proof that an entity willfully caused another person to erroneously believe a certain state of things, and that person reasonably relied on this erroneous belief to his or her detriment.  Equitable estoppel prevents an entity from repudiating an action or right if it would harm another who reasonably relied on the action or right.

The Millers challenge the jury's finding on question no. 6, alleging the evidence showed they obtained Board approval to enclose their large lanai for unit B-604 on May 17, 2005 and incurred costs for material and labor in reasonable reliance on that approval.  The Millers acknowledge the Association presented evidence that some material costs were incurred prior to obtaining approval, but assert they purchased materials for the enclosure after approval was received and retained a structural engineer and hired a glazing contractor.

The Millers cite no evidence to support their assertion that they purchased materials for their lanai enclosure after May 17, 2005.  With regard to the hiring of the structural engineer, the Millers cite the testimony of Ray Sievers (**Sievers**), but Sievers testified the Millers hired a professional engineer in response to concerns raised regarding their lanai enclosure, not in reliance on the Board's action on May 17, 2005.  The Millers

11

cite no evidence for their assertion that they hired a glazing contractor based on the May 17, 2005 Board meeting.

There is evidence that the Millers ordered materials and paid funds related in part to the lanai enclosure before seeking Board approval.  The record contains a proposal from Glass Products Hawaii, Inc. for sliding doors and windows for the Millers' unit B-604, including for the living room door, dated February 15, 2005 and signed by Mr. Miller on March 14, 2005. Another exhibit is a check in the amount of $21,407.06 dated March 16, 2005, signed by Mr. Miller, with notations "50% down on windows/glass sliders $16,407.06" and "Draw #4 5,000 labor & material."  Mr. Miller testified that when he wrote the check dated March 16, 2005, he was not relying on any approval from the Board and that he spent that money before he had approached the Board.  Mrs. Miller testified she understood they needed Board approval before they enclosed their lanai, and that they spent money before they got Board approval.

The evidence also shows that the Association Bylaws required unit owners to observe all governmental laws, ordinances and regulations, and that the Millers obtained an "after-the-fact" building permit on December 20, 2005.  However, even then, the building permit application sought a permit to "reconfigure[] interior walls[,]" and the issued permit was for "apartment interior alteration" with no specification to enclose the lanai. (Emphasis added).

The evidence also shows that within weeks of the May 17, 2005 Board meeting, correspondence and emails were sent to the Board, which included Mrs. Miller, from other owners raising concerns about the lanai enclosure for the Millers' unit B-604. Further, in an email to owners (including Mrs. Miller) dated June 15, 2005, Dan Stockhammer, a member of the Board, addressed concerns raised by other owners about the build out in the Millers' unit, stated that construction had been halted, and stated that he had been the first to ask for halting construction about a month prior.  Moreover, Sievers sent another email dated

June 15, 2005, responding to owners who had raised concerns about the build out in the Miller unit, in which Sievers also noted that construction had been halted.  The evidence also shows that the Bylaws required the Millers to obtain approval for the lanai enclosure from the other owners directly affected, but that they did not do so.

Subsequently, on November 30, 2005, a special owners' meeting of the Association was held to consider removal of Board members, and three directors were removed and replaced.[5]  In a December 8, 2005 letter, the Association Manager asked the Millers to stop work on their unit until after the Board meeting on December 16.

Thereafter, three letters were sent to the Millers that they should stop work on the lanai.  In a December 20, 2005 letter to the Millers, the Association Manager stated there had been a Board meeting on December 16, 2005, the Board had decided to hire its own structural engineer to answer concerns about the structural integrity of enclosing the B-604 lanai, and the Board had asked the Association Manager to write the Millers and ask them not to do any work in their unit even with a building permit until they obtained final approval from the Board.  After receiving reports that work had resumed on the lanai, the Association's management company sent the Millers two letters on February 6, 2006, demanding that they cease all work on the lanai.

Thus, there is evidence from which the jury could find that the Millers paid for windows and glass sliders before seeking permission from the Board to construct a lanai enclosure, that within weeks of the May 17, 2005 Board meeting there were strong concerns raised to the Board by other owners and at least two emails by Board members reflect that construction on B-604 had been halted, that due in large part to concerns about the

_____

[5]  The day before the election, Mrs. Miller resigned from the Board and was replaced by the then remaining Board members.  At the November 30, 2005 meeting, a majority of owners voted to remove Sievers, but then voted him back onto the Board.

Millers' lanai enclosure several Board members were removed and replaced at a special owners' meeting on November 30, 2005, and subsequently the Association Manager and Association's management company specifically and repeatedly advised the Millers to stop work on the lanai enclosure.

In sum, there was evidence to support a finding that the Millers could not reasonably have relied on the Board action on May 17, 2005 to continue with the lanai enclosure.  See State Farm Mut. Auto. Ins. Co. v. GTE Hawaiian Tel. Co., Inc., 81 Hawaiʻi 235, 244, 915 P.2d 1336, 1345 (1996) ("[A]bsent manifest injustice, the party invoking equitable estoppel must show that he or she has detrimentally relied on the representation or conduct of the person sought to be estopped, and that such reliance was reasonable.") (emphasis in original) (citation and internal quotation marks omitted); Strouss v. Simmons, 66 Haw. 32, 43, 657 P.2d 1004, 1012 (1982).

Thus, there is evidence to support the jury's finding that estoppel did not prevent the Board from denying the Millers' request to install the lanai enclosure.

**F.    Special Verdict Question No. 7: there was evidence for the jury's finding that the Millers' lanai enclosure affected the structural integrity of the Hololani buildings**

The Millers contend the jury could not permissibly find that their lanai enclosure affected the structural integrity of the Hololani because, under Bernard v. Char, 79 Hawaiʻi 371, 903 P.2d 676 (App. 1995), such a finding requires expert testimony which the Association had not provided.  However, Bernard involved a dental malpractice claim in which this court noted that "unlike the ordinary negligence case, it is the general rule that a malpractice case based on negligent treatment cannot be established without expert medical testimony to support it."  Id. at 377, 903 P.2d at 682 (emphasis added).  This court explained that in malpractice cases, a jury is generally required to determine whether, *inter alia*, a defendant's professional conduct conformed to the standard of care for the profession, and thus

expert opinion evidence was generally required to aid the jury. Id.  The instant case, however, does not involve malpractice claims or standards of care for a profession, and Bernard is inapposite.

Here, the jury heard testimony from Thompson about widespread spalling or cracking in the concrete at Hololani, and that Thompson had seen concrete falling from the lanai ceiling of the Millers' unit when contractors were working on the lanai enclosure.  Furthermore, Boomer testified that his company had been hired to repair the lanai slabs at Hololani and that while working on a lanai on the eighth floor, they started jack hammering, which caused vibration, and one of the parapets fell off the building.  Boomer further testified that based on inspections of lanais at Hololani, they determined the lanais were in very poor condition and were an extremely high safety risk, that the Millers' enclosed lanai prevented Boomer from assessing and repairing damage to their lanai, but other lanais showed that damage started on the outer edges and spread toward the building, and that 52 other lanais had that exact condition. Boomer also testified about photos, which were shown to the jury and admitted into evidence, showing common or typical conditions that Boomer saw during his work at Hololani, including "rotting rebars, causing concrete failure."

Finally, although there was conflicting evidence from experts regarding the degree to which lanai enclosures affected structural integrity at the Hololani, there was further evidence to support the jury's finding.  The court appointed structural engineer Brandon Erickson (**Erickson**), who testified with respect to a discussion he had about spalling on the lanais and that he believed there were multiple deficiencies which would require more study before he could recommend how to correct them. Erickson acknowledged that "enclosing the lanais is making a bad situation a little bit worse, but that bad situation is already so bad that the little bit worse doesn't matter."  Erickson testified that the difference between enclosing the large makai-

15

facing lanai and the smaller lanai attached to each end unit, from a structural engineering perspective, was that the larger lanai would require more weight of construction material to either level the lanai slab or to enclose it.  He also explained that the seismic issue is related to the weight of the building "[s]o the more weight required to enclose the lanai and convert it into interior space, the more the seismic forces go up. So enclosing a small lanai has less of an effect than enclosing a large lanai."  Erickson further explained that, from a structural standpoint, the position of the glass in an enclosed lanai induces more stress on the concrete slab because it is at the edge of the slab rather than the interior of the slab or the wall.

Given the record, there is evidence for the jury's finding that the Millers' lanai enclosure affected the structural integrity of the Hololani building.

G.     **Special Verdict Question No. 9: the Millers did not prove by a preponderance of the evidence that their apartment's two lanais were part of the apartment**

The Millers contend that jury instruction number 25 "established unequivocally" that the Millers' apartment consisted of and was inclusive of two lanais when it defined the Millers' apartment as "consist[ing] of . . . two (2) lanais . . . contain[ing] an area of approximately 1,227.94 square feet inclusive of the lanais."  Therefore, the Millers contend, the jury's finding that the Millers did not prove by a preponderance of the evidence that the Millers' two lanais were part of the apartment was "manifestly against the weight of the evidence."

As discussed, *supra*, each Hololani apartment includes the air space within its respective lanais, but not the floor or ceiling of the lanai.  Therefore, the jury instruction was consistent with the Bylaws because it defined the apartment as including the square footage of the air space contained within the lanai, and the jury's finding was not manifestly against the weight of the evidence.

**H.    Special Verdict Questions Nos. 10 and 11: the Millers did not prove by a preponderance of the evidence that the Board was prevented by the doctrine of *ultra vires* from disapproving their lanai enclosure**

The Millers contend that the Board was prevented from denying the Millers' request to enclose the lanai under the doctrine of *ultra vires* because the Millers' request complied with the Board's own enclosure protocols and standards.  We disagree. As was explained to the jury, under the doctrine of *ultra vires*, a decision-maker may not act beyond his or her powers, and the Board "has an obligation to abide by the legal limits of its powers and not to exceed those delineated powers."

Although the Board had implemented certain standards for lanai enclosures, the Millers' request was still subject to Board and other owners' approval as mandated by the Bylaws. Therefore, the Board was not required to grant the Millers' construction request merely because the request conformed to the standards.  As discussed, *supra*, there is evidence that the Millers' request was denied, not based on the whim of the Board, but, rather, for the safety of the entire building and to conform to the other owners' wishes.  The Board followed the Bylaws' procedures, and its action in denying the Millers' request therefore did not violate the doctrine of *ultra vires*.

The Millers further contend that the Board was prevented from initiating the lawsuit against them under the doctrine of *ultra vires* because the Board did not follow the Bylaws' protocols.  The Millers urge us to hold that the jury failed to follow the jury instruction by ignoring the following fact read to it by the Circuit Court:

> Prior to the initiation of the lawsuit against the Millers by Board of Director Owen Gallagher, the retention of the Motooka Yamamoto and Revere law firm was not brought to the attention of the entire Board nor was the decision to initiate suit made by motion or approved by vote of the Board of Directors at any properly-convened meeting and/or executive session of the Board of Directors.

However, the Millers ignore the instructions the Circuit Court gave to the jury immediately prior to reading the fact,

> [i]n this case, there are certain facts that I'm going to read to you that are <u>facts that you may consider</u> in reaching your verdict.
>
> . . .
>
> <u>[I]t does not mean that you are to give any greater or lesser weight to these facts simply because I am reading these facts to you</u> and that it is occurring at this point of the trial. . . . These statements are evidence like any other evidence presented during a trial that you <u>may consider.</u>
>
> The weight that you give these facts, like any other fact, should be determined in a manner consistent with the Court's instructions of law. <u>The weight you give this evidence is for you to decide.</u>

(Emphasis added).  Therefore, the jury was not required to take the fact as conclusive evidence, and was free to give greater weight to other evidence regarding the Board's actions.

There is evidence that the Board did not violate the doctrine of *ultra vires* because Article VII § 2 of the Bylaws and Section E of the House Rules empower the Board to initiate legal action against the Millers to enforce provisions of the Declaration, Bylaws, and the House Rules.  Furthermore, evidence in the record reflects that the Millers' attorney threatened the Association with legal action unless the Board approved the enclosure, the Board attempted to avoid litigation through mediation, and, when efforts to avoid litigation were unsuccessful, the Board unanimously voted to pursue litigation against the Millers.  Thus, we cannot hold that the Board failed to follow its own procedures, acted outside its powers, or that the jury failed to follow instructions.

## II.  The Circuit Court's judgment was not illegal for omitting language pertaining to the county's building permit requirement

The Millers apparently urge us to conclude that the Circuit Court's order reversing the Millers' construction efforts is illegal because the Circuit Court failed to specify that the construction reversal would require a building permit.  We disagree.  The Circuit Court properly required the Millers to remove the lanai enclosure and restore the door, as they had violated the Association's governing documents.

### III. The Millers' arguments concerning other legal causes entitling them to a new trial

The Millers contend the following circumstances affected their ability to have a fair trial and they are entitled to a new trial under Hawaii Revised Statutes (**HRS**) § 635-56 (2016):[6] (1) the trial was too long and they had to present their case piecemeal; (2) the Circuit Court failed to use Findings of Fact not in dispute; (3) the Circuit Court delayed in disclosing the decisions of the Discovery Master to the jury; (4) the Circuit Court excluded expert witness James Stewart; (5) the Circuit Court excluded witness John A. Morris; (6) the Millers were prevented from impeaching Stuart Allen, then president of the Board; and (7) the asserted misconduct by Association's counsel, Terrence M. Revere.

The parts of the Opening Brief addressing the Millers' argument they are entitled to a new trial for the above reasons do not comply with Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28 in many respects.  See HRAP Rule 28(b)(4)(D) ("Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented.").

The Millers fail to include these issues in their Points of Error section pursuant to HRAP Rule 28(b)(4), and for most of these issues the Millers fail to provide in their briefs "where in the record the alleged error occurred," Rule 28(b)(4)(ii), or "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court" as required by Rule 28(b)(4)(iii).

---

[6]  HRS § 635-56 provides:

> **§ 635-56  Grounds for new trial**. In any civil case or in any criminal case wherein a verdict of guilty has been rendered, the court may set aside the verdict when it appears to be so manifestly against the weight of the evidence as to indicate bias, prejudice, passion, or misunderstanding of the charge of the court on the part of the jury; or the court may in any civil or criminal case grant a new trial for any legal cause.

Further, regarding their claims about admission or rejection of evidence, the Millers fail to provide "quotation of the grounds urged for the objection and the full substance of the evidence admitted or rejected" required by Rule 28(b)(4)(A), and as to instructing the jury, the Millers fail to provide "quotation of the [jury] instruction [] given, refused, or modified, together with the objection urged at trial" under Rule 28(b)(4)(B). Furthermore, for these seven alleged errors, the Opening Brief argument provides only five citations to the record and one case citation, with one additional case cited in the Reply Brief, in violation of HRAP Rule 28(b)(7) and (8), which require "citations to the authorities, statutes and parts of the record relied on." With a record on appeal spanning eleven docket numbers and transcripts spanning some 85 docket numbers, we decline to "sift through the voluminous record to verify an appellant's inadequately documented contentions." Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 114 n.23, 176 P.3d 91, 113 n.23 (2008) (internal quotation marks and citation omitted).

We address the Millers' arguments that cite legal authority or provide a discernable reference to the record.

**A.   Decisions of the Discovery Master**

The Millers cite Ray v. Kapiolani Med. Specialists, 125 Hawaiʻi 253, 269, 259 P.3d 569, 585 (2011) for their contention that the Decisions of the Discovery Master should have been provided to the jury at an earlier time, rather than when the jury received its instructions. However, Ray is inapposite because it dealt with improperly admitted testimony that was referred to numerous times by multiple witnesses, and the trial court did not provide a curative instruction until almost a month after the testimony was admitted. Id. Here, the issue is not improperly admitted testimony and a late curative instruction. Moreover, after the Circuit Court initially denied the Millers' request to have the Decisions of the Discovery Master provided to the jury after opening statements and to have the parties work on the issue further, the Millers cite no other point in the record

20

where they requested submission to the jury, nor do they establish how they were prejudiced.

On May 16, 2014, during a hearing on motions *in limine*, the Circuit Court requested that the Millers provide with specificity what they would present to the jury from the Discovery Master so that the court could determine whether it would be admissible at a later Hawaiʻi Rules of Evidence (**HRE**) Rule 104 hearing.[7]  Also on May 16, 2014, the Millers filed their "Decisions of the Discovery Master to be Presented to the Jury and Additional Decisions Relevant to Evidence" and sought to present them to the jury after opening statements on May 19, 2014.  The Association objected on the grounds that the Millers failed to provide context or citations for the Discovery Master decisions in their filing.  The Circuit Court denied the Millers' request, among other issues, as follows:

> THE COURT: Here is what I'm going to do.  I don't want to waste the jurors' time.  We'll begin the presentation of evidence by the [Association].  And if [the Millers are] handicapped by that in terms of your cross-examination, I'll give you time with extra work on that over the evening.  I don't think we're going to get through a lot here.  But I don't want to waste the time that we do have.

Apart from this initial determination by the Circuit Court to proceed with the Association's first witness without the introduction of the Discovery Master decisions, the Millers fail to explain whether a HRE Rule 104 hearing took place, where in the record the Circuit Court determined the admissibility of the decisions, and where the Millers thereafter attempted to introduce the Discovery Master decisions to the jury.

### B.  Testimony of Stuart Allen

With regard to the testimony of Stuart Allen, the Millers contend they should have been allowed to impeach Allen's

---

[7]  HRE Rule 104(a) (1993) provides, in relevant part:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

credibility based on alleged bad acts he committed shortly after a settlement conference in May 2014.  The Millers filed a Motion to Continue Trial Date (**Motion to Continue**) on May 13, 2014, asserting, *inter alia,* that Allen had emailed a letter to the Board and other Hololani owners containing "false and confidential information" with the aim to "create hostility towards the Millers that would eliminate any tendency of the Board to increase its last offer."  The Millers requested more time to investigate Allen's alleged bad acts and whether the Association's counsel, Terrence M. Revere, had contributed to the drafting of the email for possible sanctions.

The Association filed an opposition to the Motion to Continue on May 14, 2014, arguing, *inter alia,* that the Millers had mischaracterized the email and that it had been sent only to Board members and not to owners.  The Association further asserted the information contained in the letter was not confidential under any Hawaii rule, case, statute, or order, and the letter was accurate.

The Circuit Court held a hearing for the Motion to Continue on May 14, 2014, and denied the motion.  The Circuit Court allowed Allen to testify and held that the events related to the settlement conference were not an appropriate area for examination.  The scope of cross-examination at trial is within the discretion of the trial court and "[t]he trial court's exercise of its discretion to limit the scope of cross-examination will not be ruled as reversible error when it limits irrelevant . . . questions by counsel and the limitation does not result in any manifest prejudice[.]"  State v. Peseti, 101 Hawaiʻi 172, 178, 65 P.3d 119, 125 (2003) (citations and brackets omitted).  We conclude the Circuit Court did not abuse its discretion and the Millers fail to demonstrate any manifest prejudice.

###### C.     Asserted Misconduct by the Association's Counsel

With regard to the Millers' argument that the Association's counsel improperly editorialized or commented on

the evidence, they provide references to a few instances in court transcripts, but these references show the Circuit Court sustained objections by the Millers' counsel. For other general arguments regarding the conduct of opposing counsel, the Millers' failure to demonstrate they objected or raised it to the Circuit Court precludes our consideration of their general arguments "in accordance with the fundamental rule that misconduct occurring upon a trial must be brought to the attention of the court when it occurs or is discovered, and unless objected to cannot be relied upon as error upon a motion for new trial or upon appeal." Young v. Price, 48 Haw. 22, 29, 395 P.2d 365, 370 (1964) (citations omitted).

In sum, we do not find merit in, or alternatively decline to address, the Millers' seven asserted circumstances they claim entitle them to a new trial.

**IV. The Millers' Motion to Alter and Amend Judgment**

Finally, the Millers contend that the First Amended Final Judgment entered in favor of the Association by the Circuit Court is improper because (1) it orders them to do construction work that requires a building permit; (2) the Circuit Court failed to determine the equitable claims because certain jury determinations are merely advisory; (3) there was no evidence their lanai affected the structural integrity of the Hololani; and (4) the Association unreasonably withheld approval of the Millers' after-the-fact request to move their entryway door.

On February 22, 2016, the Millers filed their Motion to Alter or Amend First Amended Final Judgment filed on February 11, 2016. The Circuit Court's Order Denying the Millers' Motion to Alter or Amend First Amended Final Judgment was based on the motions submitted by the parties and a hearing on April 20, 2016. However, the Millers fail to provide the transcripts for the April 20, 2016 hearing in the record on appeal. "[I]t is well established that, when an appellant desires to raise any point on appeal that requires the consideration of the oral proceedings before the court appealed from, the appellant bears the burden of

23

showing error by reference to matters in the record, and he or she has the responsibility of providing the relevant transcript." Ditto v. McCurdy, 103 Hawai'i 153, 162, 80 P.3d 974, 983 (2003).

Moreover, based on what is contained in the record, we conclude the Millers' arguments are without merit.  First, the Millers apparently urge us to conclude that the Circuit Court's order requiring the Millers to remove their lanai enclosure and restore the entryway door is illegal because the Circuit Court failed to specify that they obtain a permit.  The Millers asserted the same argument during a March 11, 2015 hearing on the Millers' prior Motion to Alter or Amend Final Judgment filed on February 9, 2015.  During that hearing, the Circuit Court noted the practical considerations of obtaining a permit and that it would recognize reasonable efforts to comply with the earlier judgment.  With respect to the First Amended Final Judgment, the Millers make no showing that they made any effort to comply, sought to obtain a building permit, or had any difficulty obtaining a permit.

Second, with regard to the Millers' argument that the Circuit Court needed to determine all equitable claims, we agree with the Association that the Circuit Court did decide the equitable issues by entering its First Amended Final Judgment.

Finally, the Millers again raise arguments challenging (a) the finding that the Millers' lanai enclosure affected the structural integrity of the Hololani building, and (b) whether the Millers proved that the Association unreasonably withheld approval of their after-the-fact request to move their entryway door.  As discussed previously, there was ample evidence in the record on both of these issues to support the jury's findings. The Circuit Court did not err in entering judgment accordingly.

**V.   Conclusion**

Based on the foregoing, we affirm the "First Amended Final Judgment" filed on February 11, 2016, and the "Order Denying [the Millers'] Motion to Alter or Amend First Amended

Final Judgment" filed on May 6, 2016, by the Circuit Court of the Second Circuit.

DATED:  Honolulu, Hawaiʻi, March 22, 2021.

On the briefs:

Brian R. Jenkins,
J. Kevin Jenkins,
for Defendants-Appellants/
Counterclaimants-Appellants.

Terrance M. Revere,
Lauren C.M. Sheppard,
for Plaintiff-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Karen T. Nakasone
Associate Judge